IN THE UNITED STATES DISCTRICT COURT

EASTERN DISTRICT OF ARKANSAS

**JULIA PRINCE JONES**                                                                                  **PLAINTIFF**

vs.                              Case No: 4:19-CV-527

**LINDA GRANT, et al.**
**each in their Individual and Official Capacities**

                                                                                                            **DEFENDANTS**

## BRIEF IN SUPPORT OF
## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

COMES THE Plaintiff, through counsel, and for this Brief states:

**I. Qualified Immunity is not supported by the text of 42 U.S.C. § 1983.**

Pursuant to Fed.R.Civ.P. 11(b)(2), Marziale respectfully submits that a good faith argument, briefly summarized here, suggests that the doctrine of qualified immunity is based on a faulty legal analysis. In fact, many Supreme Court justices and legal scholars have questioned its legal basis and its validity as a defense.[1] Recognizing the weight of adverse precedent on this issue, Plaintiffs present their position briefly.

---

[1] Supreme Court justices have questioned the continued viability of qualified immunity in its current state as it is contained nowhere in the text of 42 U.S.C. § 1983. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1872 (2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Kisela v. Hughes*, 138 S.Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (the Court's "one-sided approach to qualified immunity" has "transform[ed] the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In further elaborating the doctrine of qualified immunity . . . we have diverged from the historical inquiry mandated by the statute."); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment

"Statutory interpretation . . . begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Few judicial doctrines have deviated so sharply from this axiomatic proposition as qualified immunity. 42 U.S.C. § 1983 provides in relevant part:

Every person *who*, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

"The statute on its face does not provide for any immunities." *Malley v. Briggs*, 475 U.S. 335, 342 (1986). The operative language just says that any person acting under state authority who causes the violation of any federal right "shall be liable to the party injured." The unconditional nature of this provision is confirmed by the succeeding clause, which creates a limited exception for actions against judicial officers. The expression of one limitation alone implies the exclusion of other such limitations. *See Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992).

---

of qualified immunity under 42 USC § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume."); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("In the context of qualified immunity . . . we have diverged to a substantial degree from the historical standards."). Further, many scholars have likewise questioned the viability of this doctrine and called for its abolition. *See* The most recent issue of the *Notre Dame Law Review* gathers several scholarly essays that carefully examine qualified immunity and discuss potential refinements in light of mounting legal and empirical criticism. Symposium, *The Future of Qualified Immunity*, 93 Notre Dame L. Rev. 1793 (2018); *see also, e.g.*, William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 88 (2018) (claiming the doctrine "lacks legal justification, and the Court's justifications are unpersuasive"); Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 70 (2017) (concluding that "the Court's efforts to advance its policy goals through qualified immunity doctrine has been an exercise in futility"); John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 Fla. L. Rev. 851, 869 (2010) ("Today, the law of qualified immunity is out of balance.... The Supreme Court needs to intervene, not only to reconcile the divergent approaches of the Circuits but also, and more fundamentally, to rethink qualified immunity and get constitutional tort law back on track.").

This unqualified command makes sense. The statute was passed by the Reconstruction Congress as part of the 1871 Ku Klux Klan Act to help combat lawlessness in the southern states. This purpose would have been undone by anything resembling modern qualified immunity jurisprudence, as the Fourteenth Amendment had been adopted only three years earlier, and its provisions were obviously not "clearly established law" by 1871. Had §1983 been understood to incorporate qualified immunity, then Congress's attempt to address rampant civil rights violations in the post-war South would have been toothless.

"Certain immunities were so well established in 1871, when §1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish them." *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993). Qualified immunity currently immunizes "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. But legal history does not justify importing any such open-ended defense into the operation of §1983. On the contrary, the sole historical defense against constitutional torts was legality.

A clear example of this principle is Chief Justice Marshall's opinion in *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804). Federal law authorized the seizure of ships going to France, but President Adams had directed the seizure of ships coming from France as well. An American naval captain captured a Danish ship coming from a French port. *Id*. at 178. The question was whether he could rely on the president's instructions as a defense against liability for his otherwise unlawful seizure. The court considered but ultimately rejected the very rationales that would come to support the doctrine of qualified immunity. Chief Justice Marshall explained that "the first bias of my mind was very strong in favor of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages." *Id*. at 179. He noted that the captain had acted in good-faith reliance on the president's order, and that the ship had been "seized with pure intention." *Id*. Nevertheless, the court held that "the instructions cannot change the nature of the transaction, or

legalize an act which without those instructions would have been a plain trespass." *Id*. The officer's only defense was legality, not good faith.

This strict rule of personal official liability persisted through the nineteenth century – see, e.g., *Miller v. Horton*, 26 N.E. 100, 100-01 (Mass. 1891) (Holmes, J.) (town health board members liable for wrongful killing of animal on orders of government commissioners) – and into the twentieth. In *Anderson v. Myers*, 182 F. 223, 230 (C.C.D.Md. 1910), African-American citizens sued Annapolis voting officials for having been denied the right to vote pursuant to a state statute that violated the Fifteenth Amendment. The defendants argued that they could not be liable for money damages under §1983 because they acted on a good-faith belief that the state statute, never repealed, was constitutional. The circuit court rejected the argument:

> [A]ny state law commanding such deprivation or abridgment is nugatory and not to be obeyed by any one; and anyone who does enforce it does so at his known peril and is made liable to an action for damages by the simple act of enforcing a void law to the injury of the plaintiff in the suit, and no allegation of malice need be alleged or proved.
> *Anderson v. Myers,* 182 F. 223, 230 (C.C.D. Md. 1910).

The Supreme Court affirmed. *Myers v. Anderson,* 238 U.S. 368 (1915). A principal rationale for qualified immunity is the purported existence of similar immunities that were well-established in the common law of 1871. But to the extent contemporary common law included any such protections, they were incorporated into the elements of particular torts, not as a free-standing immunity. As the Court explained in *Pierson v. Ray*, 386 U.S. 547 (1967), "[p]art of the background of tort liability, in the case of police officers making an arrest, is the defense of good faith and probable cause." *Id*. at 556-57. This defense was not a protection from liability for unlawful conduct. Rather, at common law, an officer who acted with good faith and probable cause simply did not commit the tort of false arrest in the first place.    *Id*.

Qualified immunity jurisprudence soon discarded this tether to common-law torts permitting a good-faith defense. See *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974). And in 1982, the Court

disclaimed reliance on subjective good faith at all, basing qualified immunity instead on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rest is history. Qualified immunity functions today as a free-standing, across-the-board defense based on a judicially created "clearly established law" standard that was unheard of before the late twentieth century. The doctrine has become a "freewheeling policy choice" at odds with Congress's judgment in enacting §1983, *Malley*, 475 U.S. at 342, leading to calls for its reconsideration coming from as high as the Supreme Court. The Defendants in this case should not have recourse to it.

**II.     Even if Qualified Immunity Doctrine is available, there are genuine issue of material fact precluding summary judgment**

Pursuant to *Harlow Fitzgerald*, 457 U.S. 808 (1982), a qualified immunity analysis involves a two-part analysis. A defendant must first prove that he was performing a discretionary function at the time of the alleged conduct. Here, Defendants were not performing a discretionary function because they were operating outside the law. There is at least a genuine issue of material fact on this issue. Indeed, Plaintiff argues she is entitled to a finding that Grant was acting outside the scope of her license as a matter of law, while operating an unlicensed infirmary. And the guards were untrained and operating under a policy that violates the ADA and Arkansas state law.

The concept of qualified immunity was articulated by the U.S. Supreme Court in Harlow v. Fitzgerald, 457 U.S. 808 (1982). According to the Harlow court, the defense of qualified immunity represents a balance between the right of a citizen to address constitutional wrongs and the right of the governmental actors to be protected from insubstantial claims. Id. at 814-815 (1982). The defense of qualified immunity is premised on the "assumption that this standard would permit '[i]nsubstantial lawsuits' [to] be quickly terminated." Id. With respect to the defense of qualified immunity, the U.S. Supreme Court held in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982):

We therefore hold that government officials performing discretionary

> functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
> Further, the Supreme Court noted that qualified immunity protects all but the plainly incompetent or those who "knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Johnson v. Phillips* 664 F. 3d 232, 238, 239 (8th Cir. 2011), the Eighth Circuit acknowledged that an official is not entitled to qualified immunity when performing a non-discretionary act as follows:

> In *Hawkins v. Holloway,* 316 F.3d 777 (8th Cir.2003), this court held that an official acting outside the clearly established "scope of his discretionary authority is not entitled to claim qualified immunity under § 1983." *Id.* at 788. In rejecting a sheriff's contention that he was entitled to qualified immunity for threatening his employees with a firearm, *Hawkins* adopted the reasoning of *In re Allen,* 106 F.3d 582 (4th Cir.1997).
>
> Drawing on Supreme Court precedent and the common law principles underlying qualified immunity, the Fourth Circuit in *Allen* said "it was well recognized at common law that a government official who exceeded his authority enjoyed no immunity." *Id.* at 592; *see also Butz v. Economou,* 438 U.S. 478, 495, 98 S. Ct. 2894, 57 L.Ed.2d 895 (1978) (stating that qualified immunity does not "abolish the liability of federal officers for actions manifestly beyond their line of duty"). The court thus held that "an official who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity under § 1983." *Allen,* 106 F.3d at 593. In *Allen,* a state attorney general was not entitled to qualified immunity for organizing a corporation, because it was clearly established that this activity was outside the scope of his authority. *Id.* at 598. Several other circuits have adopted a similar approach. *See, e.g., Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265–67 (11th Cir.2004) ("We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."); *Shechter v. Comptroller of N.Y.,* 79 F.3d 265, 268–70 (2d Cir.1996) (to enjoy qualified immunity, "the defendant must show that the conduct of which the plaintiff complains falls within the scope of the defendant's official duties"); *Merritt v. Mackey,* 827 F.2d 1368, 1372–73 (9th Cir.1987); *ee also Mackey v. Dyke,* 29 F.3d 1086, 1095 (6th Cir.1994) ("[T]he defendants bear the initial burden of coming forward with facts that show they were acting within their **discretionary** authority at the time in question.").

*Johnson v. Phillips* 664 F. 3d 232, 238, 239 (8th Cir. 2011).  When determining whether an officer is performing a discretionary task, the courts look to applicable state law.  *Estate of Cummings v. Davenport,* 906 F3d 934, 939-44 (11th Cir. 2018).  As demonstrated by Grant's testimony,  Ex. 4 at PP. 10-11, , Grant was were acting outside the scope of her license, if she was expected to the medical monitoring for persons in the restraint chair.   Indeed, she does nothing except note the call.  Ex 4 at P. 11-12.   Indeed, the guards weren't even required to contact Grant.  Ex 5 at Pp. 7-8.  Thus, the individual defendants were not performing a discretionary function and are not entitled to qualified immunity.  Even if the Court disagrees, qualified immunity should be denied.

If a defendant establishes he/she was performing a discretionary function, the burden shifts to the plaintiff to prove that the defendants' conduct violated clearly established law and this defense boils down to the question of whether the Defendant "violated a 'clearly established' right."  *Camreta v. Greene*, 131 S.Ct. 2020, 2031 (2011), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Court need not address these two elements in order.  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009).

To demonstrate that the law is "clearly established," a plaintiff must show that the official had fair warning of what the law required.  One way to show 'fair warning' is by pointing to a prior case with similar facts, but that is not the only way to do so. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 271 (1997) (recognizing that a general constitutional rule may apply with "obvious clarity to the specific conduct in question," even though the challenged conduct has not previously been held unlawful); *see also Hope v. Pelzer*, 122 S. Ct. 2508 (2002). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful,

but it is to say that in light of preexisting law the unlawfulness must be apparent." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 788 (6th Cir. 2012). In any event, "the salient question" is whether the officers had "fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer,* 122 S. Ct. 2508, 2515-2516 (2002).

Further, qualified immunity can be denied in obvious cases even when there is no relevant factually specific body of case law which has been repeatedly observed by the U.S. Supreme Court and the Eighth Circuit as follows:

> "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White,* 580 U.S., at ——, 137 S.Ct., at 552 (internal quotation marks omitted). But the general rules set forth in "*Garner* and *Graham* do not by themselves create clearly established law outside an 'obvious case.'" *Ibid.*

*Kisela v. Hughes*, 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018)  Hence, the issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the plaintiff's] right not to be seized by the use of excessive force." *Craighead,* 399 F.3d at 962. "[I]n an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law." *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (internal quotations marks omitted). *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015). But here there is specific case law on point.

"[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). "The interest survives a criminal conviction and incarceration, pretrial detention, or involuntary civil commitment. Of course, a detainee's liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty." *Benjamin v. Fraser,* 264 F.3d 175, 188 (2nd Cir.2001) (citations omitted).

In *Pardue v. Glass,* No. 05-5004, 2008 WL 249173, at *17 (W.D. Ark. Jan. 29, 2008), the detainee was to be let out of the chair after "no more than 2 hours." And there were instructions about how to use the chair. Here, the policy allowed restraint for four hours, and there are no instructions. In Pardue v. Glass, No. 05-5004, 2008 WL 249173, at *20 (W.D. Ark. Jan. 29, 2008), although it appeared defendants did "check" on Pardue every fifteen minutes, the only credible evidence presented to the court was that Pardue was only allowed out of the chair once during this entire period of time by Crane at approximately 3:00 a.m. or 3:15 a.m. During the remainder of the time, Pardue was not medically monitored, allowed to do range of motion exercises, allowed to eat or drink, or allowed to use the restroom. The Court there found a constitutional violation.

The facts are worse here. DE 29-2 Pp. 10-15. Plaintiff had a lethal dose of phenobarbital in her system, had a seizure disorder, was not allowed to use the restroom according to the logs, and was held in the restraint chair for far more than four hours. Indeed, the policy allowed restraint without medical physician for four hours at a time and examined at hour intervals. DE 29-2 Pp. 53-55. In the main, tasing a person with a disability to wake her up, Plaintiff's Ex 3, Deposition at P. 22:6-11, tasing a person with disability when she is a restraint chair, Plaintiff's Ex 3, Deposition at P. 23:24-25, P. 24:1-7, restraining a person with a seizure disability on the order of a jailer without medical supervision, DE 29-2. Pp 10-15, Plaintiff's Ex 3, Deposition at P. 38:24-25 P. 39:1-3, and keeping a person with disability restrained in her own urine for hours on end, Plaintiff's Ex 3, Deposition at P. 83:21-22. The law was clearly established that medical supervision was required when a restraint chair was used in a detoxification process that exceeded two hours. Indeed, the policy allowed restraint without physician supervision for four hours at a time and examined at hour intervals. DE 29-2 Pp. 53-55. This is punishment, and summary judgment should be denied.

And in *Griffis v. Medford,* No. CIV. 05-3040, 2008 WL 2945562, at *23 (W.D. Ark. July 28, 2008), aff'd, 348 F. App'x 194 (8th Cir. 2009), the restraint chair at issue in this case was purchased

from E.R.C. Inc. According to the instruction manual accompanying the chair, a detainee should be not be left in the chair for more than two hours. *Id.* at page 1.

The manual stated:

> This time limit was established to allow for the detainee to calm down or sober up, and if needed allows for the correctional officer to seek medical or psychological help for the detainee. This two hour time limit may be extended, but only under **direct** medical supervision (Doctor/Nurse). This extended time period must not exceed eight hours and range of motion exercises must be performed regularly. Therefore we do not recommend that anyone be left in the Emergency Restraint Chair for more than ten hours total.

In this case, there are only conclusory allegations of training. In this case, there is no manual, and the evidence is undisputed that the Plaintiff was not under any type of medical supervision. Indeed, the policy allowed restraint without physician supervision for four hours at a time and examined at hour intervals. DE 29-2 Pp. 53-55. Thus, qualified immunity should be denied.

**III. The Sheriff's policy allowing restraint for four hours without medical supervision is unconstitutional and violates the ADA, especially with no training manual from the manufacturer.**

Arkansas Health Regulations and Jail Standards set the minimum standards for restraints. Exhibits 1 and 2. As demonstrated above, there is no support for a policy that allows restraint to be ordered by a jailer with no medical training to detoxify an individual with disability without physician supervision in an unlicensed infirmary is not supported in the law. While some use of such a restraint chair might serve a legitimate purpose, *see e.g., Fuentes v. Wagner,* 206 F.3d 335 (3d Cir.2000)(affirming denial of motion for judgment as a matter of law following a jury verdict that use of the restraint chair on a pretrial detainee for eight hours did not constitute punishment where inmate was checked every fifteen minutes, released every two hours for ten minutes to stretch, exercise, and use the toilet and where inmate was given a meal and seen by medical staff), its use on Plaintiff under the circumstances at issue in this case clearly constitutes punishment. Its use was excessive in relation

to the purpose assigned to it-for the safety and security of the facility. There is no reason to retrain Plaintiff for hours in her own waste. While the Plaintiff does not doubt that it is sometimes absolutely necessary in this setting to use some type of restraint or security measures, the use of the restraint chair for the duration at issue in this case against a pretrial detainee, without close monitoring and some provision for short periods during which the inmate is relieved of the restraints and given an opportunity to move around, drink, and use the restroom facilities, amounts to unconstitutional punishment. *Pardue v. Glass*, No. 05-5004, 2008 WL 249173, at *21 (W.D. Ark. Jan. 29, 2008). At the very least, Plaintiff's testimony, along with the restraint logs, demonstrate a constitutional violation that this policy allows. And the lack of training is obvious.

Nurse Grant has testified that she does not monitor the person in the restraint chair, Ex 4 at Tracee Williams has admitted she had no training. Ex 5 at P. 14. Officer Scott, the person who decided to place Plaintiff in the chair, was trained to check on her every 15 minutes for a maximum of 4 hours. Ex 6 at P. 22. And the restraint logs reflect that Plaintiff was not removed from the chair for hours at a time. DE29-2 Pp. 10-15. In fact, she was not even checked every 15 minutes. This is the epitome of an unconstitutional policy and a failure to train. Summary Judgment should be denied.

      Respectfully submitted,

      **SUTTER & GILLHAM, P.L.L.C**.
      Attorneys at Law
      P.O. Box 2012
      Benton, AR 72018
      501/315-1910  Office
      501/315-1916  Facsimile
      Attorney for the Plaintiffs

By:   */s/ Luther Oneal Sutter*
      Luther Oneal Sutter, ABN 95031
      luthersutter.law@gmail.com

CERTIFICATE OF SERVICE

  I, Luther Oneal Sutter, hereby certify that on this 16th day of October, 2020, I have served a copy of the foregoing upon counsel for Defendant by ECF as follows:

Jason Owens

              /s/ *Luther Oneal Sutter*
              Luther Oneal Sutter