# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**JULIA PRINCE JONES**                                        **PLAINTIFF**

**v.**                          **No. 4:19-cv-00527 PSH**

**KAREN GRANT and CALENE SCOTT**                    **DEFENDANTS**

## MEMORANDUM AND ORDER

### I. Introduction

Plaintiff Julia Prince Jones ("Jones") filed this lawsuit against Nurse Karen Grant and Sergeant Calene Scott (the "Defendants") in both their individual and official capacities pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.,* as amended ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("RA"), the Arkansas Civil Rights Act ("ARCA"), and Ark. Code Ann. § 16-118-107 (civil action by crime victim statute). Doc. No. 21. Jones alleges that, while incarcerated at the Faulkner County Detention Center ("FCDC"), she was placed in a restraint chair for many hours without appropriate medical treatment. *Id.* Jones alleges that Sergeant Scott placed her in the restraint chair and Nurse Grant was responsible for providing medical treatment while Jones was incarcerated at the FCDC. *Id.* Jones seeks damages and injunctive relief, although she is no longer incarcerated at the FCDC. *Id.* at 7-8.

Before the Court is the motion for summary judgment, a brief in support, and statement of undisputed material facts filed by the Defendants (Doc. Nos. 27-29). Jones filed a response, supporting brief, and statement of disputed material facts (Doc. Nos. 32-34). The Defendants filed a reply (Doc. No. 35). For the reasons described herein, the Defendants' motion for summary judgment is granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case.  *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).  Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment.  *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts

Grant and Scott filed a statement of the material facts as to which they contend there is no genuine dispute to be tried (Doc. No. 29).  Grant and Scott also submitted Jones' medical records from Conway Regional Medical System (Doc. No. 29-1); an affidavit by FCDC Jail Administrator Chris Reidmueller attaching relevant jail policies[1] and documents from Jones' jail file (Doc. No. 29-2); an affidavit by Grant (Doc. No. 29-3); and an affidavit by Scott (Doc. No. 29-4).

---

[1] The policies provided by Defendants include the FCDC's emergency medical policy (Doc. No. 29-1 at 42-43); the FCDC's detainee sick call policy (*id.* at 44-47); the

Jones filed a response to the statement in which she admitted some of the facts, admitted other facts but with qualifications or argument,[2] and denied still other facts with no explanation or citation to documentary evidence (Doc. No. 33).[3]  Jones also submitted the following exhibits:  Criminal Detention Facility Standards 2014 (Doc. No. 32-1); Arkansas Department of Health Rules and Regulations for Hospitals and Related Institutions in Arkansas (Doc. No. 32-2); the deposition of Jones[4] (Doc. No. 32-3); the deposition of Defendant Karen Grant (Doc. No. 32-4); the deposition of non-party Tracee Williams (Doc. No. 32-5); and the deposition of Defendant Calene Scott (Doc. No. 32-6).

Having reviewed the Defendants' statement of facts, Jones' response, and the other pleadings and exhibits, the Court finds the following facts.

### *Jones' Attempted Suicide and Treatment at Conway Regional*

On February 4, 2019, Jones attempted to commit suicide by taking a large number of barbiturates, and her husband took her to Conway Regional Medical

---

FCDC's detainee health care policy (*id.* at 48-52); and the FCDC's restraint chair policy (*id.* at 53-55).  Only the restraint chair policy is discussed herein.

[2] The Court disregards any argument made in the parties' statements of facts.

[3] The non-moving party was instructed in the Court's scheduling order to "state with particularity that portion of the allegation denied, citing to any evidentiary support for the denial."  Doc. No. 15 at 2.

[4] By the time her deposition was taken, Jones had changed her last name to Burbridge.  The Court continues to refer to her as Jones.

Center's Emergency Department.[5]  The hospital records reflect that at some point after she arrived, Jones began screaming at, and threatening to kill, members of the hospital staff; swinging at, and hitting, staff members; biting her husband; and threatening to "blow up the emergency department." Doc. No. 29-1, *Conway Regional Medical Records,* at 13-14, 16, 21.  Jones denies she committed assault and battery.[6]  Doc. No. 33 at 1.  The hospital records reflect that after Jones calmed down, "she reported it was not a suicide attempt but that she just wanted to feel better after a bad day."  Doc. No. 29-1 at 21.  Jones also "endorsed remorse about biting her husband while he was attempting to assist staff, threatening to kill [them]."  *Id.* at 25.  Jones was not given any medications at the Emergency Department, and she was not admitted for further evaluation or treatment.  *Id.* at 2-20.  Upon discharge, Jones was advised to see her primary care provider at her next available appointment. *Id.* at 6.  The Conway Police Department was contacted, and Jones was "disch[arged] to law enforcement" at 8:02 p.m.  *Id.* at 3.  Her condition was listed as stable at the time of her discharge.  *Id.* at 4 & 25.

---

[5] Defendants represent that Jones presented to Conway Regional on February 4, 2018.  *See* Doc. No. 29 at 1.  However, the hospital records reflect that Jones presented to the Conway hospital on February 4, 2019.  *See* Doc. No. 29-1 at 2.

[6] In her deposition, Jones testified that she does not recall anything that happened at the hospital but believes she may have lied about the number of pills she had taken.  Doc. No. 32-3 at 12, 20-22.  She testified that she took 120 phenobarbital pills as well as Ambien, Topamax, Keppra, and marijuana.  *Id.* at 18-19. Jones was prescribed phenobarbital for epilepsy.  *Id.* at 18.

### *Arrest & Detention at FCDC*

Conway police officers arrested Jones for offenses that included assault and terroristic threatening, then transported her to the FCDC where she was incarcerated. Doc. No. 29-2, *Riedmueller Affidavit and Jail Records,* at 3-5. A notation on an intake form reflects that Jones "did not remember being treated [at] the hospital— stated she took 120 phenobarbitals trying to kill herself [and] would do so again . . ." *Id.* at 9. Almost immediately upon entering the jail, she became disruptive, banging her head on a door and threatening self-harm and suicide. *Id.* at 25-26; Doc. No. 29-4, *Calene Scott Affidavit,* at 1.

According to Defendant Sergeant Scott, a supervisor in booking, he authorized Jones' placement in a restraint chair for her own protection because of her actions of self-harm. Doc. No. 29-4 at 1; Doc. No. 32-6, *Deposition Testimony of Calene Scott,* at 4, 8. A restraint chair is a "slightly reclining chair with locking straps at the ankles and wrists." *See* Doc. No. 29 at 1. At 8:30 p.m., Corporal Joseph Scott placed Jones in a restraint chair. Doc. No. 29-2 at 10, 25. While Defendant Sergeant Scott does not recall assisting with Jones' placement in the chair, he does not dispute reports that indicate he did. Doc. No. 29-4 at 1. Sergeant Scott's shift ended at 11 p.m. on February 4, 2019, approximately two and one half hours after Jones was placed in the restraint chair. Doc. No. 32-6 at 13.

Jones remained incarcerated at the FCDC until February 6, 2019, when she was involuntarily committed and taken to St. Vincent Hospital. The Court summarizes below restraint logs, incident reports, and statements from officers at the FCDC to describe her time there.

*February 4, 2019*

A FCDC Suicide and Medical Watch Log dated February 4, 2019, indicates that Jones was placed in the restraint chair at 20:30 (8:30 p.m.). Doc. No. 29-1 at 10. A box marked "suicide watch" was checked, and a box marked "medical watch" was not checked.[7] Approximately every 15 minutes, an officer initialed the watch log and entered notations about Jones' status. From 20:42 until 21:45, the notations indicate that Jones was "yelling in chair." From 22:00 until 22:30, the notations indicate she was showering. From 22:45 until 1:00, the remarks indicate she was yelling in the chair. The officers' initials on this log include: JS, TS, TW, and KH.

*February 5, 2019*

Another log dated February 4, 2019, but starting at 1:00 a.m. also listed Jones as being on suicide watch. Doc. No. 29-2 at 11. (It appears this is the log for the

---

[7] The bottom of the form lists protocol for medical watch and for suicide watch. The Medical Watch Protocol states that permission from nurse must be obtained; that the inmate be closely monitored, checked every 15 minutes, and released when informed to do so by the nurse; that a report must be placed in medical box at the end of shift; and that medical directives must be followed with no deviation. The suicide watch protocol simply states, "Make sure you follow the entire protocol."

morning of February 5, 2019, since Jones was not incarcerated at the FCDC at 1:00 a.m. on February 4, 2019.)  The remarks on this log indicate that Jones was checked approximately every 15 minutes until 6:35 a.m. and was yelling in the chair at each check.  However, no remark was made between 2:49 and 3:15 a.m. or 3:30 and 4:00 a.m. (*i.e.*, there is no notation of any kind at 3:00 a.m. or 3:45 a.m.).  The officers' initials on this log include:  TW, TS, and KH.

An incident report dated February 5, 2019, contains statements by two officers regarding a bathroom break for Jones at approximately 3:00 a.m.[8]  Doc. No. 29-2 at 17.  Officer Tracee Williams stated:

> On the above date approximated time I officer Tracee Williams and Officer Karrie Hall were instructed by to give Detainee Julia Jones a bathroom break.  Before we let her up she threaten to shoot us and fight us as I uncuffed her I asked her was she going to be combative.  She stated that she would not.  She could not walk and did not have to use the bathroom so I put her back into the chair where she then started kicking and hitting Officer Hall and I.  She then put her fingernails into Officer Hall.  Officer Hall made several attempts to remove Detainee Jones.  She then ended on the floor kicking.  Corporal Joseph Scott then picked her up and put her into cell B20.  This is all I have to report at this time.  End of statement.

*Id.*  Officer Karrie Hall stated:

> I OFFICER HALL WAS INSTRUCTED BY CPL. SCOTT TO GIVE DETAINEE JONES A BAHROOM BREAK.  WENT DOWN TO UNLATCH HER AND ONCE THE HAND CUFF SHE KICKED OFFICER T. WILLIAMS AND DUGG HER NAILS INTO MY LEGS.  I DID EVERYTHING I COULD TO GET HER OFF OF MY

---

[8] FCDC jail records are quoted verbatim with no corrections for misspellings or typographical errors.

LEG. THEN CPL SCOTT STEPPED IN AND PICKED DETAINEE JONES AND TOOK HER TO B20. THIS IS ALL I HAVE TO REPORT AT THIS TIME. END OF STATEMENT.

*Id.*

A new log dated February 5, 2019, appears to begin after the previous log ended at 6:35 a.m. Doc. No. 29-2 at 12. Neither suicide watch nor medical watch is checked on it. *Id.* The remarks state that Jones was sitting in the restraint chair at 6:45 a.m. and had her vitals checked at 7:00. At 7:15, the remarks state that Jones was "placed back in the chair unable to walk or sitting on the bench w/o falling." At 7:45, she was listed as sitting in the restraint chair. At 8:00 a.m., her vitals were taken again, and she stated she was not suicidal. These entries were all initialed by KM with the number 328.

An incident report dated February 5, 2019, at 7:15 a.m., created by Corporal Kristin McCann states:

> On the above date and approximate time, Officer Martin and myself went to let Detainee Jones out of the chair. Detainee Jones couldn't walk on her own so we took her vitals and moved her to the bench. Detainee Jones couldn't sit without falling so we placed Detainee Jones back in the chair for her safety. I talked to Nurse Grant about Detainee Jones and [she] told me to have her pee in a cup. I let Detainee Jones out of the chair to use the bathroom. She couldn't undress herself so I helped her. Detainee Jones states she could use the bathroom after about 10 minutes of trying. Detainee Jones then laid down on her mat. Approximately, five minutes later Detainee Jones was yelling and beating on the door. Detainee Jones was placed back in the chair. While Detainee Jones was in the chair she stated she was going to kill herself a lot. This is the end of my statement.

*Id.*

Another medical and suicide watch log dated February 5, 2019, indicates that Jones was placed back into the chair at 8:40 a.m. "hitting on door." Doc. No. 29-13. At 8:55, she was "in chair talking," and at 9:00 and 9:15, "yelling." The officers' initials on this log include: TG and KM. There are no entries after 9:15 a.m. on this log.

A final log dated February 5, 2019, listed Jones as on Suicide Watch and states that she was placed in the chair at 16:10 (4:10 p.m.). Doc. No. 29-2 at 14. Remarks recorded approximately every 15-30 minutes state that she was talking, screaming, or yelling until 23:00 (11:00 p.m.) when she was let out of the chair and placed in room #20. These entries were initialed by KM, TG, and KH. There are no additional notations on this log, and the next log (described below) begins at 6:50 a.m. the next day.

Officer Tracee Williams wrote an incident report stating:

On [February 5, 2019, at 22:18 (10:18 p.m.)] I Officer Tracee Williams, Officer Thomas Samanich, Corporal Joseph Scott, Sgt. Calene Scott, where going to take Detainee Jones out of cell B20. After she had bangged her head against the door. Then as we went into get her out she then dug her fingernails into myu arm, scratching my arm. Officer Samanich, Corporal Scott, Sgt. Scott and I restrained her in the chair. Detainee Jones then tried to spit on me where we then put a spit mask on her. This is all I have to report at this time. I am submitting this for your review. End of statement.

Doc. No. 29-2 at 17-18.  Based on the suicide watch log for this date, this incident may have occurred in between the checks on Jones at 22:10 and 22:32.  *See id.* at 14.

*February 6, 2019*

Corporal Joseph Scott wrote the following incident report:

On [February 6, 2019, at 6:00 a.m.] detainee Jones, Julia was brought out her cell for fingerprints she wouldn't act right while I was doing her fingerprints so Officer Tracee Williams took over and started to process with the fingerprints.  As Officer Williams started to continue she began to fall in between the AFIS and the wall.  Not only did she just fall but she wouldn't get up and had her hand grabbing the back of the AFIS machine and wouldn't let go so I drive stun her and then she let the AFIS machine go.  After trying and trying to get her to finish she then swung on Officer Karrie Hall and Officer Hall and Officer Williams took her to go to the ground using the least amount of force as possible.  After getting her back up to fingerprint her left hand she then jerked away from Officer Williams and then swung at me so I sprayed her with a 5 second burst of OC spray.  End of my statement.

Doc. No. 29-2 at 18.  Regarding the same incident, Officer Hall stated:

DETAINEE JULIA JONES WAS INSTRUCTED TO WAKE UP SO SHE COULD GET HER FINGER PRINTS DONE AND SHE WOULD NOT GET UP SO CPL. SCOTT ASKED ME TO COME DOWN AND GET HER UP SO I DID.  I OFFICER HALL HELP DETAINEE JULIA JONES FIND HER WAY OUT OF CELL #B20 TO THE FINGER PRINT WALL.  I THEN TRIED TO HELP CPL. SCOTT HOLD HER UP WHILE HE DOES HER FINGER PRINTS. SHE KEPT TALKING STUFF SO OFFICER WILLIAMS TOOK OVER DOING THE FINGER PRINTS.  DETAINEE JULIA JONES BEGAN TO TRY AND RUN AWAY AND WHILE TRYING TO GET AWAY SHE SWINGS ON OFFICER WILLIAMS AND I SO CPL. SCOTT TASED THE DETAINEEE.  SHE GOT BACK UP SAID "SO YOU THINK THAT SHIT HURT ME I BEEN TASED BEFORE".  THE OFFICER WILLIAMS TRIED TO FINISH FINGER

> PRINTS AND SHE NOT WANT TO COMPLY THEN CPL. SCOTT
> PEPPER SPRAYED THE DETAINEE. FINALLY FINISHED HER
> FINGER PRINTS ONCE IT WAS TIME FOR HER TO SIGN HER
> NAME ON THE FINGER PRINTS SHE SWUNG ON OFFICER
> WILLIAMS AND OFFICER WILLIAMS TOOK DETAINEE TO
> THE GROUND AND OFFICER SAMANICH HELPED TAKE
> DETAINEE TO B20. ABOUT 15 MIN LATER OFFICER
> WILLIAMS AND I TOOK DETAINEE JULIA JONES TO THE
> SHOWER ROOM TO DETOX HER. THIS ALL I HAVE TO
> REPORT AT THIS TIME. END OF STATEMENT.

Doc. No. 29-2 at 18. An interoffice memo by Officer Hall contains the same statement but also states: "THERE WERE NO TEETH MISSING FROM HER MOUTH AT ALL. SHE STILL HAD ALL TEETH." *Id.* at 20.

Officer Williams also wrote an incident report about the February 6, 2019 fingerprinting incident. Doc. No. 29-2 at 18-19. She wrote:

> ON [February 6, 2019 at approximately 6:00 a.m.] I OFFICER
> TRACEE WILLIAMS ASSISTED CORPORAL JOSEPH SCOTT,
> OFFICER KARRIE HALL, OFFICER THOMAS SAMANICH.
> CORPORAL SXOTT ASKED OFFICER THOMAS SAMANICH TO
> HOLDER HER UP WHILE HE WOULD FINGERPRING
> DETAINEE JONES, JULIA, SHE WAS NON COMPLIANT SO I
> ASKED OFFICER SAMANICH TO STEP ONTO THE PODUUM
> TO ASSIST CORPORAL SXOTT AND OFFICER HALL. WHEN I
> STEPPED DOWN SHE TOLD ME "MY WRIST HURT AND THAT
> SHE WOULD DO IT HERSELF. I THEN GOT ABOUT THREE
> FINGERS DONE. THEN JERKED WAY FROM ME TO TRY AND
> SWING HER FIST AT OFFICER HALL I THEN GRABBED HER
> ARM AND TOOK HER TO THE GROUND AND TOLD HER "YOU
> WILL NOT HIT ANOTHER OFFICER" SHE THEN GOT UP AND
> YELLED AND CUSSED AT OFFICER HALL AND CORPORAL
> SCOTT, SHE THEN SAID "IM NOT DOING THE FINGERPRINTS
> AND FELL BETWWEN THE WASLL AND FINGERPRINTS AND
> FELL BETWEEN THE WALL AND FINGERPRINT MACHINE.
> OFFICER HALL THEN TRIED TO ASSIST ME IN TRYING TO

REMOVE HER. SHE STILL DID NOT MOVE. CORPORAL SCOTT THEN TASED HER. SHE THEN GOT UP AND REFUSED TO DO ANYTHING AT THIS TIME. CORPORAL SCOTT THEN MASED HER. ABOUT THREE MINUTES LATER I FINSHED HER FINGERPRINTS AND SHE THEN JERKED AWAY FROM AS IF SHE GOING TO HIT ME AS IT WAS IT WAS TIME FOR HER TO HAVE HER SIGNATURE AS SHE AS SHE SWANG HER FIST AT ME I THEN TOOK HER TO THE GROUND WITH AT LEAST FORCE AS POSSIBLE. OFFICER SAMANICH ASSISTED HER ON PUTTING HER IN THE CELL. THIS IS ALL I HAVE TO REPORT AT THIS TIME I AM SUBMITTING THIS FOR YOUR REVIEW.

*Id.*

A FCDC Restraint Chair Log dated February 6, 2019, indicates that Jones was yelling in the chair at 6:50 and 7:00 a.m. Doc. No. 29-2 at 15. The remarks state that she had a bathroom break at 7:15 and 7:30 a.m. At 7:49, the log documents that Jones "stated that when she gets out of here she's going to blow her head off. KB 384." At 7:53, she was recorded as having used racial slurs against officers and threatening to "put her wrath" on them when she gets out of the chair. The remarks indicate she was yelling at 8:05 and was allowed a bathroom break at 8:15 before being put back in the chair at 8:31. She was sitting in the chair at 8:45, 9:00, and 9:15, and had a bathroom break at 9:25. At 10:00, she was yelling, and stated she was going to break her wrist at 10:25. At 10:30, she was removed from the chair and chained for court. The entries only contain one officer's initials and number: KB 384. There are no additional notations on this log.

A suicide log form dated February 6, 2019, picks up where the last log ended. Doc. No. 29-2 at 16. It indicates that Jones was "placed in chair for hanging herself" at 11:20 a.m., and then continued yelling, threatening staff, and being combative until 12:30 p.m. At 12:45, she threatened to hurt herself as soon as she gets up. The log indicates she was at court for an involuntary commitment hearing from 13:00 until 14:05, when she was placed back in the chair. The officers initialing this log include: 337 TD, 369 BH, 332 TK, and 392 JC.

Jones was released to St. Vincent Hospital later that day.[9] *Id.* at 33.

### *Statement by Corporal Joseph Scott*

Jones' jail records include the following statement by Corporal Scott.

Detainee Julia Jones was brought into the facility for possible suicide. She was stating that she was trying to kill herself. So we put her on suicide watch in the restraint chair. After following our restraint chair/suicide policy we had to restart the process because after her time was that she would stay again she was going to try to kill herself if we got her out of the chair. This is the end of my statement for the first day. The next day as we was walking into the booking she was in the restraint chair again for the same reasons. She kept stating that she was going to try to kill herself. After she calm down she was placed into B 20 where she was sleep. Time was whining down for first appearance as she had to be fingerprinted to even go to court. So Officer Karrie Hall and I entered B20 to get her up. While we trying to fingerprint her. She started to refuse to even be fingerprinted. She tried to spit in Officer Tracee Williams face and Officer Karrie Hall face but her mouth was

---

[9] An inmate tracking from indicates that she was moved from cell B20 to 508 on February 6, 2019, at 18:55 (6:55 p.m.). Doc. No. 29-2 at 56. Jail Administrator Reidmueller explained in his affidavit that "508" refers to an out-of-facility assignment. *Id.* at 1.

so dry that she couldn't. She fell between the a FIS machine in the wall and grabs hold onto the a FIS machine where we couldn't even get her up so I had to drive stun her to even try to get to let go we finally gotten her up to fingerprint and she started to be combative again. There's was she sprayed a one second burst of OC spray. After that she was detoxed. This is the end of my statement for that day. The next day she was brought back from the hospital and I was letting her know what happens and she stated that she didn't remember anything that happened but the only thing that she remembered that she tried to kill herself. This is the end of my encounter with detainee Julia Jones.

Doc. No. 29-2 at 25.

## Statement by Officer Thomas Samanich

Jones' jail records include the following undated statement by Officer Thomas Samanich.

 . . . I Officer Thomas Samanich was working in booking when detainee Jones, Julia came in. Corporal Joseph Scott, officer Karie Hall, Officer Tracee Williams, and I were told she was suicidal and she was being combative. We put here in the restraint chair to prevent her from hurting herself and others. We followed our policy took her out of the chair every hour to use the facilities. She would act up every time we did this. When her time was up in the restraint chair we would take her out and put her in the cell. Every time we did that she would start banging on the door. She would get combative towards us so we put her in the restraint chair. After the third time we took her out we had to do her fingerprints. Officer Williams was attempting to do them when he starting to fight with her and was trying to spit at her. She would pretend to fall in between the AFIS machine. When corporal scott, officer hall, and officer williams would get her back up she would start fighting again. This is we corporal warned he would stun her. She did not listen so he dry stunned her. Officer williams got her fingerprints done and put her in her cell. This is the end of my report.

Doc. No. 29-2 at 26.

### *Testimony of Tracee Williams*

Non-party Tracee Williams was an officer at the FCDC while Jones was incarcerated there in February 2019. Doc. No. 32-5, *Deposition Testimony of Tracee Williams,* at 5. In her deposition, she testified that the restraint chair at the FCDC was not used to punish inmates but to protect them from harming themselves or others. *Id.* at 7. She recalled that Jones behaved abnormally and was combative and aggressive and banged her head against the wall. *Id.* at 5, 8-9. Williams explained that when an inmate is harming themselves, FCDC officers would put them in the restraint chair and call the nurse. *Id.* at 9, 14. She said that if the nurse instructed them that the inmate needed to be removed from the chair, they would remove the inmate. *Id.* at 10. Williams also recalled that at one point, Jones had calmed down and was removed from the chair to go to the bathroom and then placed in her cell where she took a nap, but she began banging her head again once she woke. *Id.* at 16.

### *Testimony of Sergeant Calene Scott*

In his deposition, Sergeant Scott testified that he had been trained to use the restraint chair when an inmate was combative or threatened to hurt himself. Doc. No. 32-6 at 5. He also testified that the restraint chair is not used as punishment; instead, it is used to protect the inmates from harming themselves or others. *Id.* at 5, 9 & 18. He further testified that pursuant to the policy in effect when Jones was

incarcerated, inmates could be kept in the chair for up to four hours. The policy also provided that an officer check on the inmate every 15 minutes to make sure they were okay and the cuffs were not too tight. *Id.* at 6-7. Sergeant Scott explained that after an inmate is in the restraint chair for four hours, he is placed in a cell. However, if an inmate continues to hurt himself, he would be put back in the chair. *Id.* at 10. He explained that inmates are also allowed to use the bathroom within certain times while they are in the chair. *Id.* at 35. Scott explained that the restraint chair is not placed in a room but in an open area in front of cameras. *Id.* at 15 & 32-33.

Sergeant Scott testified that a nurse is informed when an inmate is placed in the chair, especially if the inmate has hurt himself. He did not contact the nurse in Jones' case because he was not "running the shift." *Id.* at 10 & 13-14. Corporal Joseph Scott was running the shift. *Id.* at 23. According to Sergeant Scott, a nurse is present in the facility from 8:00 a.m. until 4:30 p.m. If an inmate is placed in a restraint chair after hours, the nurse is called on the phone and can come to the facility if necessary. *Id.* at 30.

### *FCDC Restraint Chair Policy*

Jail Administrator Captain Chris Riedmueller provided a copy of the FCDC's relevant jail policies with his affidavit. Doc. No. 29-2 at 1. The restraint chair policy provides "specific information regarding the use of any 'restraint' chair device in the detention facility and to make certain that all employees are familiar with this

policy." *Id.* at 53. It defines a restraint chair as a "chair type device equipped to restrain or limit the movement of persons who, because of their behavior and actions create a substantial risk of danger to themselves, others and/or damage to property and must be restrained." *Id.* The policy states that staff members must obtain the approval of the shift supervisor "to use the restraint chair as necessary to control subjects who display behavior which creates a substantial risk of destruction of property or who places themselves and/or others in danger of physical harm." *Id.* The policy provides detailed instructions for placing an inmate in the chair, including how to fasten handcuffs, lap belts, leg shackles, and arm belts. *Id.* It provides that a disposable spit mask may be used if the inmate spits on deputies placing the inmate in the chair. *Id.* The remainder of the policy provides:

**2.    Miscellaneous Information:**

a.    Shift supervisor must authorize the use of the restraint chair. If medical requests an inmate be placed in the restraint chair for medical reasons, the shift supervisor will arrange for adequate staff to assist medical in placing the inmate in the chair.

b.    The restraint chairs will be kept in areas of frequent use.

c.    The restraint chair may be moved to any location in the facility where it might be needed. The chair may be moved to an inmates' location and the inmate secured in place to facilitate movement of the inmate and the protection of the inmate and/or others from injury.

d.    Inmates who are placed in the restraint chair will be kept isolated from other inmates.

e.     The shift supervisor will be responsible for ensuring all appropriate incident reports, medical and mental health reports, observation reports and/or any other written documents are completed and updated as required.

f.     Only staff members who have been trained in the use of the restraint chair and other restraint equipment will be allowed to secure restraint devices on any inmate.

g.     The shift supervisor will be present and will directly supervise the placement of any inmate and a restraint chair, if possible.

h.     The shift supervisor, in conjunction with medical, will monitor the current conditions and behavior of the inmate in order to determine when it is appropriate to remove the inmate from the restraint chair.

i.     When an inmate is removed from the restraint chair, staff will examine the inmate for any injuries that might have been sustained during the incident this will be documented in the inmates booking records and noted in the shift supervisors report.

j.     After each use all buckles, straps and other restraints on that restraint chair will be returned to appropriate "ready" positions and checked for any defects or damage.

k.     Care and maintenance of all restraint devices are very important and will follow the recommendations of the manufacturer.

## 3.     Observation of Inmate in Restraint Chairs:

a.     A written observation log will be maintained for any inmate who is placed in a restraint chair. (See attachment #1)

b.     Inmates placed in a restraint chair will be offered an opportunity once every hour to use the bathroom and/or consume their meals. Should the inmate continue to exhibit violent behavior they will be placed in restraints before being removed from the restraint chair to use the bathroom or consume a meal.

c.     Staff will examine the inmate a minimum of once every hour.

d.     An inmate will not be held in the restraint chair for more than four (4) hours except in medical cases. In cases where an inmate is placed in a restraint chair for medical reasons, medical personnel will confirm with a shift supervisor, but medical personnel will make all decisions concerning the inmate.

e.     Staff members will maintain direct intermittent surveillance of any restrained inmate.  Observations will be made a minimum of four (4) times every hour.  If a staff member observes a loss of circulation in the hands or feet of an inmate in restraints, the staff member will adjust the restraints to provide for appropriate circulation to be returned to the limb.

**No adjustments will be made to any restraint devices without sufficient staff present to maintain control of the situation.**

.If an inmate complains of pain caused by restraint devices and/or placement or position in the chair, the observing staff member will follow the medical protocol.

*Id.* at 54-55.

In his affidavit, Riedmueller stated that jail staff at the FCDC are trained under a comprehensive training system that meets or exceeds that required by state law. Doc. No. 29-2 at 1.  He explained that the "training includes jail standards training, basic medical and emergency response training, use of force training, and training in the policies of the jail, including, but not limited to training in the use of the restraint chair." *Id.*  He also stated that the chain-of-command and reporting systems in the jail ensured that jail employees were properly supervised. *Id.* at 2.

### *Treatment by Nurse Karen Grant*

Defendant Karen Grant works as a Licensed Practical Nurse (LPN) at the FCDC. Doc. No. 29-3, *Karen Grant Affidavit,* at 1; Doc. No. 32-4, *Deposition Testimony of Karen Grant,* at 4. Grant first became aware of Jones the morning of February 5, 2019, when she arrived at work. Grant was informed that Jones was in the restraint chair based on her having made threats of self-harm and harm to others. Doc. No. 33 at 3; Doc. No. 29-3. Grant was also informed that Jones had been transferred to the jail from the hospital, where she had been treated for an alleged overdose of barbiturates, taken in an apparent attempt at self-harm or suicide. *Id.* Grant's understanding, both then and now, is that federal law requires a hospital to certify the medical stability of the patient prior to releasing the patient.[10] Doc. No. 29-3 at 3; Doc. No. 32-4 at 14, 19. In her deposition, Grant testified that she was not contacted when Jones was initially placed in the restraint chair, the night before she came on duty. Doc. No. 32-4 at 6. She explained:

> While in the intake call, she refused all medical treatment and they decided they did not need to call, which I sent an e-mail to their superior saying that even if she received – or even if she refused all medical treatment, they should have still at least started a medical watch for her, or called me to have one started.

---

[10] Jones maintains that Grant's understanding is inadmissible because she was acting outside the scope of her practice. Doc. No. 33 at 3. Regardless of Jones' position, the records from Conway Regional document that Jones was stable when discharged to Conway Police. *See* Doc. No. 29-1 at 4 & 25.

*Id.; see also id.* at 18-19. According to Grant, if an inmate is placed on medical watch, his or her vital signs are checked every 30 minutes to an hour. *Id.* at 37. If the vital signs are not normal, the nurse is to be contacted. *Id.*

Before Grant's first encounter with Jones on February 5, one of the jailers took Jones' vital signs on two occasions, at 7 and 8 a.m. Doc. No. 33 at 6; Doc. No. 29-3 at 2. Grant testified that vital signs include: blood pressure, temperature, pulse, pulse ox, and respiration. Doc. No. 32-4 at 37. Grant does not remember seeing or being advised of those readings at the time they were taken. The readings, however, did not indicate an emergency medical condition, particularly in light of Jones' extreme anger, and, in fact, improved from 7 to 8 a.m.[11] Doc. No. 33 at 6; Doc. No. 29-3 at 2.

Grant first encountered Jones on February 5, 2019, between 8 and 9 a.m. Doc. No. 32-4 at 40. Grant asked Jones for permission to take her vital signs or otherwise provide medical assistance. Doc. No. 33 at 5; Doc. No. 29-3 at 2; Doc. No. 32-4 at 40-41. Jones verbally refused and yelled at Grant. *Id.* Grant repeated her request a number of times that day and the next. Each time, Jones refused to allow Grant to take her vital signs or provide any assistance.[12] *Id.* According to Grant, Jones was

---

[11] Jones denies this assertion by Grant with no explanation. Doc. No. 33 at 6.

[12] Grant also claims that she offered to help Jones untangle her hair, and Jones refused that offer as well. Doc. No. 29-3 at 2. Jones denies this with no explanation.

fully coherent each time they interacted on February 5 and 6, 2016, and Jones responded appropriately, but aggressively. *Id.* Grant testified that Jones screamed profanities and repeatedly threatened Grant and any staff in the vicinity. She also repeatedly threatened to hurt or kill herself if she was let out of chair. *Id.* Grant saw no visible symptoms of any emergency medical condition.[13] Doc. No. 33 at 5-6; Doc. No. 29-3 at 2; Doc. No. 32-4 at 49.

Grant testified that she conducted a skin assessment on Jones, noting a shallow abrasion and a hematoma on her neck as well as minimal swelling and cuff marks where she had pulled on the restraints. Doc. No. 32-4 at 43. *See also* Doc. No. 29-2 at 9 (copy of skin assessment completed at 12:30 on February 5, 2019). Jones told Grant she did not remember being treated at the hospital, but said she took 129 phenobarbitals to kill herself. She said she would do so again if released. *Id.* Jones did not ask to see a doctor at any time, and Grant did not discuss Jones with the jail physician, Dr. Garry Stewart. Doc. No. 32-4 at 6-7 & 47-48.

In response to Jones' reported barbiturate overdose and her threats of self-harm, Grant completed an affidavit seeking Jones' involuntary commitment on

---

Doc. No. 33 at 5. Whether or not Jones allowed Grant to help untangle her hair is not a material fact in this case.

[13] Jones denies this assertion by Grant with no explanation. Doc. No. 33 at 6.

February 5, 2019.  She had the affidavit filed with the court the same day.[14]  Doc.

No. 33 at 6; Doc. No. 29-3 at 2-3; Doc. No. 29-2 at 25-26.  Regarding the involuntary

commitment, Grant testified:

> . . . as soon as I found out the next day that she had tried to kill herself,
> I put her in for an involuntary commitment, not because of mental
> health reasons; because anybody that is suicidal by definition that has
> come in from trying to commit suicide is placed.  An involuntary
> commitment is placed.  It goes before a judge and the judge determines
> whether they need to be involuntary committed or not.

Doc. No. 32-4 at 20.  On February 6, 2019 (the next day), an involuntary

commitment was ordered by Judge Clawson, and Jones was sent to St. Vincent

Hospital that day.  Doc. No. 33 at 6; Doc. No. 29-3 at 2-3; Doc. No. 29-2 at 28-31

& 54.

Finally, Grant stated that Jones was not in the restraint chair the entire time

she was at the FCDC.  *Id.*  She explained that Jones would have been offered a

bathroom break every hour according to policy.  *Id.* at 41-42.  Grant further

---

[14] Jones inexplicably states that she denies this fact because she was tased in her
cell and suffered injuries.  Doc. No. 33 at 6.  Whether Jones was tased has nothing to do
with Grant's preparation of an affidavit to have her committed.  Further, Jones does not
allege that she was tased by either defendant in her amended complaint, and she does not
assert any claim based on being tased.  *See* Doc. No. 15.  "'A plaintiff may not amend
[his] complaint through argument in a brief opposing summary judgment.'" *Ferrell v.
Fitzpatrick*, No. CIV. 17-5084-JLV, 2020 WL 2220243, at *15 (D.S.D. May 7, 2020)
(quoting *WireCo WorldGroup. v. Liberty Mut. Fire Ins. Co.*, 231 F. Supp. 3d 313, 318
(W.D. Mo. 2017)).  Jones has not sought leave of the court to amend her complaint to
include any claims based on being tased.  Accordingly, the Court will not consider those
allegations.

explained that every time Jones was released from the restraint chair, she tried to harm herself and had to be put back into the restraint chair. *Id.* at 42.

On February 13, 2019, Jones returned to the jail, after spending a week in the hospital and a mental health facility.[15] Doc. No. 33 at 6; Doc. No. 29-3 at 3; Doc. No. 29-2 at 32-28 & 54. On February 14, 2019, Jones bonded out of jail before her appointment to see the jail physician. Doc. No. 33 at 7; Doc. No. 29-3 at 3; Doc. No. 29-2 at 39.

Grant testified that the restraint chair at FCDC is not used for medical purposes. Instead, it is used to prevent an inmate from harming herself or others. Grant is usually notified when an inmate is placed in the restraint chair, but she has no authority to place an inmate in the chair or to remove the inmate from the chair. Doc. No. 32-4 at 11-12, 24-25 & 34.

### Testimony of Julia Jones

In her deposition, Jones testified that her first memory after overdosing on February 4, 2019, was when officers at the FCDC tased her to wake her up. Doc. No. 32-3 at 22-23. She recalls that Officer McCannon told her they tased her in

---

[15] Grant states that upon Jones' return, Grant set up a comprehensive medication and treatment plan for Jones, which included ordering her medications and setting an appointment to see the jail physician the next day. Doc. No. 33 at 7. Grant's treatment of Jones upon her return is not material to this case. Jones has not asserted any claims against Grant based on her treatment after she returned to the jail on February 13. *See* Doc. No. 15.

order to wake her up and directed officers to tase her in certain areas, but is not sure when this occurred. *Id.* at 23 & 69-75. Jones also claims she was maced and tased in the restraint chair and choked with a spit mask; she does not remember when these incidents occurred. *Id.* at 24-25 & 72-73. She believes mace was left in her eyes for a long time. *Id.* at 56. Jones does not recall which officers took these actions. *Id.* at 25 & 34. She also remembers being tased in the shower and believes she was tased multiple times.[16] *Id.* at 34 & 74-75.

Jones testified her "pieces of memory" from her incarceration at the FCDC mostly involved being in the restraint chair. *Id.* at 23-24. She further testified that she could not recall first being put in the restraint chair, but believes she spent most of her time at the FCDC in the restraint chair before she was taken to St. Vincent Hospital. *Id.* at 27. She specifically recalls an unknown male officer informing her that her time in the restraint chair would be doubled every time they started over and told her she would have to stay in the chair 24 hours. *Id.* Jones recalled urinating in the restraint chair at some point but does not know when this occurred. *Id.* at 54. She also remembered having some restroom breaks but had trouble standing to use the restroom. *Id.* at 85. Jones testified she does not remember yelling or screaming in the restraint chair but does remember sleeping some. *Id.* at 66.

---

[16] Jones makes no excessive force claims in her amended complaint related to being tased or maced. *See* Doc. No. 21.

Jones does not recall the fingerprinting incident or threatening officers. *Id.* at 54-55. She does not dispute that she threatened suicide at the FCDC, and specifically recalls asking an officer to shoot her at one point. *Id.* at 28. She also remembers trying to hang herself with a blanket and claims that officers then threw her to the ground, punched her, and slammed her head into the floor, cracking a bridge in her mouth. *Id.* at 35-38. Jones testified she did not know which officers took these actions, but remembers that Nurse Grant and Officer McCannon were present.[17] *Id.*

Jones stated she asked Nurse Grant for medical help a number of times but Grant refused. *Id.* at 39. She disputed that she refused medical treatment at the jail. *Id.* at 51. Jones claims that she was not allowed to call her husband to obtain her epilepsy medications, but does not state that she requested it from Nurse Grant. *Id.* at 33. Jones testified that Grant delayed medical care for an overdose, but provides no evidence to support that claim. *Id.* at 63 & 78. She does not know what treatment she received at St. Vincent Hospital, but knows that she was not released back to the FCDC until her phenobarbital levels were safe. *Id.* at 78. She claims she may now suffer from post-traumatic stress disorder but has not been diagnosed. *Id.* at 78-79. She also claims that she sustained the following injuries at the FCDC: a missing

---

[17] Again, Jones makes no excessive force claims in her amended complaint related to being punched, thrown to the ground, or of her head being slammed to the floor. *See* Doc. No. 21.

tooth; a black eye; choke marks on her throat; scabbing from being stomped on; a bruise on her left elbow; and tase marks. *Id.* at 60.

## IV. Analysis

### A.    ADA & RA Claims

Jones sues the Defendants under Title II[18] of the ADA and section 504 the RA. She concedes that she may not sue Defendants in their individual capacities for violations of the ADA or RA.[19] *See* Doc. No. 32-5. Jones' official capacity claims are construed as claims against Faulkner County. *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998).

The Court considers Jones' official capacity ADA and RA claims together because the two laws are "'similar in substance' and, with the exception of the RA's federal funding requirement, 'cases interpreting either are applicable and interchangeable' for analytical purposes." *Bahl v. Cty. of Ramsey*, 695 F.3d 778,

---

[18] The ADA is divided into three titles: Title I applies to discrimination in employment, 42 U.S.C. §§ 12111-12117; Title II applies to discrimination in public services, 42 U.S.C. §§ 12131-12165; and Title III applies to discrimination in public accommodations, 42 U.S.C. § 12181-12189. "State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 210 (1998)) (citing 42 U.S.C. § 12131(1)(B)).

[19] There is no individual liability under the ADA or the RA. *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1005 n. 8 (8th Cir. 1999).

783 (8th Cir. 2012) (quoting *Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir. 1999)).  To establish a prima facie case of disability discrimination under the RA or ADA, a plaintiff must prove that: "1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability."  *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citations omitted).  *See also* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  The RA also requires that the program or activity from which a person is excluded receive federal financial assistance.[20]  29 U.S.C. § 794(a).

Jones has not established a prima facie case of disability discrimination.  First and foremost, she has not clearly described her alleged disability[21] or why she would be considered "a qualified individual with a disability" within the meaning of the ADA.[22]  In one part of her Amended Complaint, Jones identifies her disability as

---

[20] Defendants do not contest that the RA is applicable to them, suggesting that Faulkner County receives federal funding.

[21] The ADA defines "disability" as "(A) a physical . . . impairment that substantially limits one or more major life activities . . . (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)–(C). *See also* 29 U.S.C. § 705 (defining "individual with a disability" as "any individual [that] has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment).

[22] The ADA defines a "qualified individual with a disability," as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

mental impairment. *See* Doc. No. 21 at 4. In another, she claims depression as her disability.[23] *Id.* at 7. In her response to the Defendants' motion for summary judgment, Jones asserts, for the first time, that her disability stems from PTSD she suffered as the result of childhood sexual trauma and epilepsy. Doc. No. 32 at 4. While Jones' suicide attempt on February 4, 2019, indicates that she suffered from some mental illness or depression at that time, she alleges no facts and provides no evidence to show that she is disabled within the meaning of the ADA or RA. Specifically, she does not claim that mental illness or depression substantially limits her major life activities, that she has a record of mental illness or depression, or that she is viewed as having mental illness or depression as an impairment.[24] Additionally, she does not claim a physical or mental impairment that results in a substantial impediment to employment. She has not provided any medical documents to establish she has a disability within the meaning of the ADA and RA. Additionally, she has provided no evidence that the Faulkner County Sheriff's Office had any knowledge that she suffered from a disability. An arrest for aggressive behavior and claims of self-harm do not establish the existence of a disability.

---

[23] In her response to the Defendants' motion for summary judgment, Jones acknowledges that the ADA does not protect persons who illegally abuse drugs, but argues it protects suicidal individuals who use legal drugs inappropriately. Doc. No. 32 at 4.

[24] *See generally Heisler v. Metro. Council,* 339 F.3d 622, 629 (8th Cir. 2003) (describing requirements to describe disability within the meaning of the ADA).

Furthermore, even if one assumed that Jones had a disability as defined by the ADA or RA, the modification or accommodation she asserts she should have received is better medical treatment. A claim for medical treatment is not cognizable under the ADA or RA. *See A.H. v. St. Louis Cty., Missouri*, 891 F.3d 721, 729–30 (8th Cir. 2018) (citing *Shelton v. Ark. Dep't of Human Servs.*, 677 F.3d 837, 843 (8th Cir. 2012); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005)).

Jones also fails to establish exclusion from a benefit or service due to discrimination based on a disability. In her Amended Complaint, Jones generally states that she was "denied program access." Doc. No. 21 at 4-5 & 7. However, she does not describe or provide any evidence of any program or service she was denied based on her purported disability as a result of discrimination. She states that Defendants refused "to enact policies that recognized persons with disabilities have impairments that require regular monitoring by a physician, not an LPN." *Id.* at 5.

Jones also claims that the FCDC's restraint chair policy impacted her medical treatment. *See id.* at ¶ 28. She asserts that she should have been immediately transported to St. Vincent Hospital for medical evaluation as a reasonable accommodation. *See* Doc. No. 32 at 4-5. She also asserts that keeping her in a restraint chair without proper medical supervision was a failure to accommodate her disability. *Id.* In sum, Jones believes she should have been afforded better medical treatment because she was suicidal and had overdosed on prescription drugs.

Because Jones' ADA and RA claims are based an alleged lack of medical treatment, they fail as a matter of law.

Finally, the record is devoid of any evidence of discriminatory intent on the part of any individual working for or affiliated with the Faulkner County Sheriff's Office.

Jones' ADA and RA claims fail as a matter of law and the Defendants are entitled to summary judgment on these claims.

## B.     *Constitutional Claims – Individual Capacity*

Defendants argue that they are entitled to qualified immunity with respect to Jones' individual capacity constitutional claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d

689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1. <u>Defendant Sergeant Calene Scott.</u>

Jones alleges that her constitutional rights under the Eighth and Fourteenth Amendments were violated because she was placed in a restraint chair and kept there for hours without appropriate medical care and no evaluation by a physician. Doc. No. 21. Sergeant Scott's only alleged involvement was authorizing Jones' placement in the chair. *Id.* at 1. Jones does not allege that Scott (or any other party) used excessive force while placing her in the restraint chair, and she does not allege that Scott was involved in any other incident involving alleged excessive force.

Because Jones was a pre-trial detainee during her incarceration at the FCDC, her claims are evaluated under the Fourteenth Amendment's due process clause. Due process requires that a pre-trial detainee not be punished prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). To support a claim for relief, a plaintiff must allege and prove that the force purposely or knowingly used against her was objectively unreasonable, and objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). "Constitutionally infirm practices are those that are punitive in

intent, those that are not rationally related to a legitimate purpose, or those that are rationally related but are excessive in light of their purpose." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

Restraining a suicidal detainee for his or own protection is constitutionally permissible. *Norris v. Engles*, 494 F.3d 634, 639 (8th Cir. 2007) (finding no constitutional violation where a pretrial detainee, who threatened to kill herself, was handcuffed, shackled, and chained to a floor grate for approximately three hours); *Glaze v. Allen*, Case No. 3:15-cv-161 KGB/BD, 2017 WL 2791190, at *5 (E.D. Ark. Feb. 27, 2017) (finding no constitutional violation where pretrial detainee was confined in a restraint chair after being argumentative and refusing to remove his clothes in order to put on a "suicide gown"); *see also Ferrell v. Fitzpatrick*, No. CIV. 17-5084-JLV, 2020 WL 2220243, at *14 (D.S.D. May 7, 2020) (citing cases) (finding that it was not clearly established "that using a restraint chair to control the behavior of a disruptive, aggressive, physically resistant pretrial detainee with mental health conditions and an injured wrist constituted impermissible punishment.").[25]

---

[25] *See also Blakeney v. Rusk County Sheriff*, 2004 WL 442672 (5th Cir. March 11, 2004) (unpublished opinion) (finding that placement of disruptive pretrial detainee in a restraint chair for twenty hours was not punitive); *Fuentes v. Wagner*, 206 F.3d 335, 343 (3d Cir. 2000) (finding use of restraint chair did not constitute punishment when used "to stop [detainee's] disruptive behavior and maintain prison order and security"); *Davis v. Lancaster Cty., Neb.*, Case No. 4:05CV3238, 2007 WL 2728549, at *6 (D. Neb. Sept. 17, 2007) (finding no constitutional violation where pretrial detainee was confined in a

Scott's only involvement with Jones at the FCDC was approving the decision to place her in the restraint chair. Jones has not asserted that Scott was involved in any other claimed constitutional violation.[26] *See* Doc. Nos. 21, 32-34 & 32-3. Scott was not involved in how long Jones was kept in the restraint chair, or in any other incident she claims occurred involving excessive force. Additionally, Scott testified that he did not call the nurse because he was not the shift supervisor. His shift ended at 11 p.m. on February 4, 2019, two and one-half hours after Jones was placed in the restraint chair. Doc. No. 32-6 at 13.

There is no evidence in the record to suggest that Scott authorized Jones' placement in the restraint chair as punishment rather than for her own protection. Nor is there any evidence that use of the restraint chair was excessive in proportion to the need to protect Jones from herself. Scott approved placing Jones in the restraint chair on the evening of February 4, for her own protection – she was banging her head on a door in an effort to harm herself, and she had taken an overdose of barbiturates, leading to her visit to Conway Regional. Doc. No. 29-4-1;

---

restraint chair after he refused direct orders, attacked a corrections officer, and caused a disturbance).

[26] A defendant may not be held liable under § 1983 unless he was personally involved in or had direct responsibility for the constitutional violation. *See Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.") (internal quotations and citations omitted).

Doc. No. 32-6 at 4 & 8. Jones' placement in the restraint chair prevented her from harming herself. Doc. No. 32-6 at 12. Jones does not dispute that she threatened to commit suicide during her incarceration at the FCDC. Doc. No. 32-3 at 28 & 35-38. Because Scott placed Jones in the restraint chair to protect her, not to punish her, his actions in doing so were reasonably related to a legitimate governmental objective[27] and were not unconstitutional.

Finally, as the cases cited above illustrate, it is not clearly established that placement of a suicidal or disruptive detainee in a restraint chair for her own protection constitutes impermissible punishment.

For these reasons, Sergeant Scott is entitled to qualified immunity with respect to Jones' individual capacity claims against him.

2. <u>Defendant Nurse Karen Grant</u>.

Jones generally alleges that Nurse Grant failed to provide her with adequate medical treatment while she was in the restraint chair. Doc. No. 21. She claims that Grant exercised medical judgment beyond her scope of practice as an LPN and should have had her evaluated by a physician. *Id.* at 2. Specifically, Jones claims that Grant had no authority to prescribe treatment for detoxification or order Jones to be restrained. *Id.* at 3. In her deposition, Jones testified that Grant delayed her

---

[27] *See Parrish v. Dingman*, 912 F.3d 464, 468 (8th Cir. 2019) ("Jailers ... have an important interest in maintaining order and institutional security.").

treatment for an overdose and refused her requests for medical treatment while she was in the restraint chair.  Doc. No. 32-3 at 39, 51, 63 & 78.

Again, pretrial detainees' claims are evaluated under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition on cruel and unusual punishment.  *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).  However, pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment.  *See id.* (citing *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999)); *see also Davis v. Hall,* 992 F.2d 151, 152–53 (8th Cir. 1993) (per curiam) (applying deliberate indifference standard to pretrial detainee's claims of inadequate medical care).[28]  To succeed with an Eighth Amendment inadequate medical care claim, a plaintiff must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs.  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  Additionally, the Eighth Circuit has held that a "prisoner must show more than

---

[28] In *Spencer,* the Eighth Circuit explained that it had never articulated an exact standard for evaluating medical treatment claims brought by pretrial detainees.  183 F.3d at 905.  The Court acknowledged that pretrial detainees' claims may be subject to an objective reasonable test rather than the subjective deliberate indifference standard.  *Id.* The Eighth Circuit addressed this issue again in *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016), where it declined to address the proper constitutional standard unnecessarily, but noted that when that case was decided it was not clearly established that a pre-trial detainee was entitled to more protection than that provided by the Eighth Amendment.

negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

There is no evidence that Grant was involved in the decision to place Jones in the restraint chair. Sergeant Scott approved the decision by other officers to place Jones in the restraint chair for her protection on the evening of February 4, 2019. Doc. No. 29-4 at 1; Doc. No. 32-6 at 8. He did not call Grant when Jones was placed in the chair. Doc. No. 32-6 at 10, 13-14 & 23. Although Grant was not called the night that Jones was placed in the restraint chair, she was made aware of Jones' placement in the restraint chair the next morning. Doc. No. 32-4 at 6. The FCDC's restraint chair policy does not require that a nurse or physician approve the use of the restraint chair; rather, the policy states that medical staff may request that an inmate be placed in the restraint chair for medical reasons. Doc. No. 29-2 at 54. The record in this case establishes that Jones was not placed in the restraint chair for medical reasons; instead, she was placed there for her own safety. Accordingly, Jones' claim that Grant was not qualified to place Jones in the restraint chair fails.

The parties dispute what happened after Grant arrived to work the morning of February 5. Jones does not remember most of her time in the restraint chair at the FCDC, but maintains that she asked Grant for medical help a number of times and Grant refused. Doc. No. 32-3 at 39. Grant claims that Jones' vital signs had been

taken by jail officers at 7:00 and 8:00 a.m. on the morning of February 5, and that Jones subsequently refused to allow Grant to take her vital signs or provide any other assistance throughout her time at FCDC. Doc. No. 32-4 at 40-41. Jones denies that she refused Grant's efforts to check her vital signs and provide other assistance. *Id.* at 51. Grant testified that Jones was fully coherent but aggressive during her encounters with Jones, and she saw no signs of an emergency medical condition warranting immediate medical treatment. *Id.* It is undisputed that when Grant became aware of Jones' behavior and suicide attempt, she prepared and had filed an affidavit and request for involuntary commitment, which was granted the following day.

The disputed facts regarding Grant's involvement with Jones do not create a genuine dispute in this matter requiring resolution by a jury for a couple of reasons. First, Jones has not produced any medical records or expert opinion testimony to establish that she suffered from an emergency medical condition at FCDC warranting immediate medical treatment or transfer to a hospital. She has not provided any medical records or expert opinion testimony that she required some specific treatment related to her overdose that should have been provided by a physician or other qualified medical care provider while she was at FCDC.[29]

---

[29] There is no indication that Jones had a need for emergency medical treatment or treatment related to her overdose that would be obvious to a layperson while she was restrained at the FCDC. *See Williams v. Whitfield*, No. 2:09CV00100 JLH/BD, 2010 WL

Without such testimony, a jury would have to resort to speculation and conjecture to determine whether Jones had serious medical needs that Grant deliberately disregarded. The Court notes that the medical evidence of record establishes that the emergency department physician at Conway Regional did not admit her to the hospital for treatment. Instead, Jones was released by Conway Regional to the FCDC in stable condition with no prescriptions and with instructions to see her primary care provider at her next available appointment.

Second, Jones has not produced any evidence to establish a delay in treatment. And even assuming a delay in treatment, Jones has not produced evidence "'to establish the detrimental effect of delay in medical treatment.'" *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (holding that an inmate must produce verifying medical evidence to show detrimental effect of a delay in medical treatment to avoid summary judgment). Indisputably, Jones has not provided any verifying medical evidence that any delay in medical treatment (*i.e.*, until her involuntary admission) caused her any specific physical injury.[30] Jones has also failed to produce any verifying medical

---

4792146, at *2 (E.D. Ark. Nov. 17, 2010) (quoting *Roberson v. Bradshaw,* 198 F.3d 645, 648 (8th Cir.1999) ("'[W]e have repeatedly emphasized that the need or the deprivation alleged must be *either obvious to the lay person* or supported by medical evidence, like a physician's diagnosis.'") (emphasis in original).

[30] The only physical injury Jones claims she suffered as a result of the restraint chair is scarring to her wrists and ankles. Doc. No. 32-3 at 63. A detainee must suffer more than *de minimis* injuries to support an excessive-force claim based on the use of handcuffs or

evidence that she has been diagnosed with or treated for PTSD or that her mental condition worsened as a result of being restrained at the FCDC. Jones claims she does not know what treatment she received while at St. Vincent Hospital after she was involuntarily committed.[31] *See* Doc. No. 32-3 at 78.

For these reasons, Jones fails to create a genuine dispute of material fact regarding whether she suffered from a serious medical condition that was deliberately disregarded by Grant. Because she cannot establish a constitutional violation, Grant is entitled to qualified immunity on Jones' individual capacity claims. Accordingly, Grant is entitled to summary judgment on Jones' individual capacity constitutional claims.

### C. *Constitutional Claims – Official Capacity*

Jones also sues Defendants in their official capacities. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Thus, a suit against a defendant in his official capacity is in essence a suit against the County or city itself. *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe*

---

physical restraints. *See Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003) (excessive-force claim failed where the only injury from handcuffing was some bleeding and no "long term or permanent injury"). There is no evidence before the Court that Jones suffered any long term or permanent physical injury from being restrained.

[31] Records from St. Vincent Hospital are not part of the record before the Court.

*v. Norton*, 157 F.3d 574 (8th Cir. 1998).  A municipality cannot be held liable on the basis of *respondeat superior*, or simply by virtue of being the employer of a tortfeasor.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013).  Accordingly, as county employees, the Defendants can be held liable in their official capacities in this case only if Jones can establish that a constitutional violation was committed pursuant to "(1) an 'official municipal policy,' . . . (2) an unofficial 'custom,' . . . ; or (3) a deliberately indifferent failure to train or supervise . . . ." *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699–700 (8th Cir. 2016) (internal citations omitted).

In her amended complaint, Jones complains that the FCDC's restraint chair policy is unconstitutional because it allows an inmate to be kept in the restraint chair for up to four hours without a doctor's supervision.[32]  Doc. No. 21 at 2 & 7-8.  Jones argues that applicable jail standards and the restraint chair manufacturer's instructions dictate that a person be kept in a restraint chair no more than two hours.  Doc. No. 34 at 9-10; Doc. No. 33.  Jones also generally asserts that the Faulkner County Sheriff's "informal policy and custom" and its failure to properly train personnel led to the violation of her rights.  Doc. No. 21 at 3-4.  Jones specifically alleges that the sheriff failed to adequately train each Defendant to provide

---

[32] In her responsive pleadings, Jones claims for the first time that the FCDC is operating an unlicensed infirmary.  Doc. Nos. 32-34.  The Court does not address that argument because it was not included in Jones' amended complaint.  *See* Doc. No. 21.

appropriate medical care, *id.* at 4, and maintains that "the lack of training is obvious." Doc. No. 34 at 11. The Court addresses Jones' policy, custom, and training claims below.

FCDC's Restraint Chair Policy

With respect to the FCDC's restraint chair policy, Jones makes no specific allegations as to why it should be declared unconstitutional other than it allows for four hours of use without supervision of a physician. She indicates that the maximum amount of time an inmate should be held in a restraint chair is two hours based on the manufacturer's instructions and applicable jail standards. Neither of these sources provide constitutional standards or due process rights to prisoners. *See generally Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003) (holding that prisoners do not have a federally protected due process right to require prison officials to comply with state law, internal rules, or procedures).

Jones also cites *Pardue v. Glass*, No. 05-5004, 2008 WL 249173, at *1 (W.D. Ark. Jan. 29, 2008), for the proposition that any policy allowing more than two hours in the restraint chair is unconstitutional. Doc. No. 34 at 9. In *Pardue,* the district court found that the placement of a detainee in a restraint chair for more than twelve hours without close monitoring and only one bathroom break constituted impermissible punishment. *Id.* at *20-21. The policy in place at that jail provided that an inmate must be allowed out of the restraint chair every two hours and taken

to the exercise yard and allowed to use the restroom. *Id.* at *7. The policy allowed the detainee to be put back in the restraint chair after each two-hour period if he or she still posed a threat to jail security. *Id.* The policy also provided that the inmate was to be checked on every 15 minutes. *Id.* The Court in *Pardue* found that the officer responsible for ensuring that Pardue was released from the restraint chair every two hours was liable because she failed to do so. *Id.* at *23. The Court also found that Washington County was liable because Pardue's constitutional rights were violated as a result of the "application of the restraint chair policy and/or failure to develop an adequate policy to ensure proper use of the chair and proper monitoring of inmates placed in the chair." *Id.* The Court did not further explain why the existing Washington County policy was constitutionally inadequate, and did not specifically state that allowing a detainee to be restrained for more than two hours was unconstitutional. Furthermore, *Pardue* has no precedential value.

The Court is aware of no controlling decisions by the Eighth Circuit Court of Appeals requiring that a detainee be supervised by a physician while kept in a restraint chair or dictating how long a detainee may be kept in a restraint chair.[33]

---

[33] In *Guerra v. Drake,* 371 F.3d 404, 405 (8th Cir. 2004), the Eighth Circuit affirmed a judgment against individual officers in favor of pretrial detainee who was left in a restraint chair for prolonged periods of time where there was no specific policy in place. The detainee appealed, asserting several procedural arguments and arguing that the District Court should have entered judgment against other parties and awarded punitive damages. Accordingly, the Eighth Circuit did not examine the propriety of the

Other Circuit Courts of Appeals as well as cases from within the Eighth Circuit indicate that policies allowing a detainee to be placed in a restraint chair for two or more hours may be permissible if the detainee is adequately monitored and allowed sufficient breaks. This Court located no caselaw specifically finding that a jail or prison's restraint chair policy was or was not constitutional. Instead, cases discussing a jail's use of a restraint chair examined whether the treatment of a detainee or prisoner was constitutional after examining all the relevant facts.[34] Because those cases provide examples that guide the Court's determination in this case, several are described below.

In *Fuentes v. Wagner*, the Third Circuit Court of Appeals found that an inmate's placement in a restraint chair for eight hours did not violate the Eighth Amendment where the inmate was checked every 15 minutes and released every two hours for 10 minutes to stretch, exercise, and use the restroom in accordance with

award in favor of detainee based on the use of the restraint chair and offers no precedential value as to what constitutes permissible use of a restraint chair.

[34] *See e.g., Undlin v. City of Minneapolis*, 2009 WL 3754208, at *6 (D. Minn. Nov. 4, 2009) (finding that dismissal of Undlin's claims on a Rule 12(b)(6) motion was inappropriate because claims based on confinement to a restraint chair require "a detailed factual inquiry into the circumstances of the chair's use."). *See also Grady v. Holmes,* 2007 WL 2507395, at *4 (S.D. Ga. Aug. 30, 2007) (finding no constitutional violation where "prison officials performed continuous observation and management" of detainee during his restraint).

prison policy. 206 F.3d 335, 345-346 (3d Cir. 2000). The Fifth Circuit noted that the detainee in *Fuentes* was also given food and checked by medical staff. *Id.*

The Fifth Circuit Court of Appeals found the placement of a detainee in a restraint chair for 20 hours constitutional in *Blakeney v. Rusk Cty. Sheriff*, 89 F. App'x 897, 899-900 (5th Cir. 2004). The Court first determined that the unruly disruptive inmate was placed in the chair for a non-punitive reason, and then examined the detainee's claims that he was not given food or water and not allowed to use the bathroom or exercise. *Id.* at 899. The Fifth Circuit did not examine the relevant prison policy, but noted testimony from jail officials stating that inmates in restraint chairs are allowed food at regular meal times and water upon request. *Id.* The detainee in *Blakeney* slept through the night in the restraint chair and was fed breakfast the next morning; there was no evidence he ever requested water. *Id.* at 899-900. He also did not request to use the bathroom, but a jail official testified that if he had done so, a determination would have been made as to whether it was appropriate to allow him out of the chair to do so. *Id.* at 900. Finally, the Court found that a jail official was not deliberately indifferent to the detainee's need to exercise because he had been told by a doctor that the restraint chair could be used for up to 24 hours. *Id.*

In *Birdine v. Gray*, a district court found the use of a restraint chair for approximately nine hours constitutional based on the following facts:

(1) Birdine was placed in the restraint chair as a last resort and only after physically resisting the officers on two occasions; (2) Birdine was constantly monitored while in the restraint chair; (3) a log of the monitoring was maintained; (4) he was observed by a nurse while in the chair; (5) when the use of the chair exceeded four hours, and according to the policies of the jail, the superintendent of the facility was called (at 4:00 in the morning) to discuss its continued use and the superintendent approved the continued use of the device; (6) Birdine was given frequent opportunities to be released from the chair, but he declined those opportunities by refusing to agree to be compliant; (7) the chair itself is designed to be as comfortable as possible—the chair reclines, it is padded, and it has arm rests; (8) there is no evidence that the restraint chair was used to punish Birdine, but rather to restrain Birdine from harming himself or damaging the holding cell; and (9) Birdine was not injured as a result of the use of the chair.

375 F. Supp. 2d 874, 880-881 (D. Neb. 2005).

In contrast, the district court in *Griffis v. Medford* found a sheriff liable for keeping a detainee in a restraint chair over a period of 11 days with only limited breaks. 2008 WL 2945562, at *27 (W.D. Ark. July 28, 2008), *aff'd*, 348 F. App'x 194 (8th Cir. 2009). In that case, the Court found that keeping the detainee confined for so long was excessive, unreasonable, and constituted impermissible punishment. *Id.* The Court also noted that jailers had testified that the detainee had been cooperative, had not caused any disciplinary problems, and was not fighting or being combative or destructive. *Id.* The detainee had initially tried to pull some stitches out, but did not continue doing so during his breaks from the chair, and it appeared that no one evaluated whether or not the detainee could be removed from the chair. *Id.*

In this case, the FCDC's restraint chair policy provides that the chair may be used to control persons who threaten destruction of property or harm to themselves or others.  Doc. No. 29-2 at 53.  It may also be used for medical reasons, but in those cases, requires that medical directions be followed.  *Id.* at 55.  In any case, the policy directs the shift supervisor to monitor the inmate's conditions and behavior in conjunction with medical to determine when it is appropriate to remove the inmate from the chair.  *Id.* at 54.  The policy also requires that the inmate be released from the chair after a period of four hours; offered the opportunity to use the bathroom and consume meals once an hour; be examined once an hour; and be observed a minimum of four times an hour.  *Id.* at 55.  The restraints are to be adjusted if the inmate exhibits circulation problems.  *Id.*

The Court finds that these provisions in FCDC's restraint chair policy meet constitutional standards even though an inmate may be restrained for a period of four hours.  The policy, *as written*, provides for sufficient monitoring of the inmate and allows for hourly breaks.  Multiple courts have found that inmates held in restraint chairs for longer periods with this type of monitoring and periodic release from the chair meet constitutional standards, particularly in the case of pre-trial detainees who are placed in the chair for their own safety or for the safety of others, and not for punishment.

Custom

Jones does not only challenge the FCDC's formal restraint policy discussed above; she also alleges that she was kept in the restraint chair for more than four hours with limited breaks as a result of the Faulkner County Sheriff's "informal policy and custom." Doc. No. 21 at 3-4. According to the Eighth Circuit Court of Appeals,

> . . . a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." Snider v. City of Cape Girardeau, 752 F.3d 1149, 1160 (8th Cir. 2014).

*Corwin v. City of Indep., MO.*, 829 F.3d 695, 699–700 (8th Cir. 2016).

Jones alleges that Faulkner County's restraint chair policy was not strictly followed in her case in that she was kept in the restraint chair for more than four hours and not allowed to go to the bathroom once every hour. However, she does not allege or provide any evidence that would establish that an unofficial custom was the cause of the alleged departures from policy. *See Davis v. Lancaster Cty., Neb.*, No. 4:05CV3238, 2007 WL 2728549, at *8 (D. Neb. Sept. 17, 2007) ("There is no evidence that the County has a policy that permits its employees to misuse the

restraint chair, nor is there evidence that by practice or custom the County has condoned the chair's misuse.").

First, Jones does not allege or provide evidence that she was kept in the restraint chair too long without sufficient breaks due to "a continuing, widespread, persistent pattern of unconstitutional misconduct." 829 F.3d at 700. The suicide/restraint logs and incident reports indicate that Jones was not kept in the restraint chair throughout her two-day stay at the FCDC. They also establish that she may have been in the chair for more than four hours on two occasions.[35] Additionally, there is conflicting evidence as to whether or not Jones was afforded the opportunity for hourly bathroom breaks in accordance with the FCDC's restraint chair policy.[36] However, there is no evidence or even an allegation that there is a

---

[35] Jones was in the restraint chair from 8:30 to 10:30 p.m. on February 4, 2019, and then taken out to shower. Doc. No. 29-2 at 10. She was back in the chair from 10:30 p.m. until approximately 3:00 a.m. when she was taken out for a bathroom break as evidenced by several incident reports (this break was not recorded on the restraint log). *Id.* at 10-11 & 17. She was in the restraint chair from 3:15 a.m. until 7 a.m. on February 5, 2019, when her vitals were taken. *Id.* at 11-12. Her vitals were taken again at 8:00 a.m. and she was in the chair again from 8:40 a.m. until 9:15 a.m. *Id.* at 12-13. There is no indication that she was in the chair again until 4:10 p.m. on February 5, 2019. *Id.* at 14. The suicide log indicates that she was in the chair until 11:00 p.m., but incident reports indicate that she was taken out at 10:10 p.m. and put back in the chair because she was banging her head on the door. *Id.* at 14 & 23. On February 6, 2019, Jones was in the chair from 6:50 a.m. until 10:50 a.m. with four bathroom breaks. *Id.* at 15. At 11:20 a.m., she was placed back into the chair for "hanging herself" until she was taken to Court at 1:00 p.m. *Id.* at 16. Jones was placed back into the chair at 2:05 p.m. after Court, but there is no indication how long she was kept there. *Id.*

[36] The suicide/restraint logs from February 4 and February 5, 2019, do not record any bathroom breaks. Doc. No. 29-2 at 10-14. The restraint log from February 6 records

*continuing, widespread, persistent pattern* on the part of Faulkner County in not following its restraint chair policy.  Second, Jones must also demonstrate that policymaking officials were deliberately indifferent to or tacitly authorized these alleged departures from policy after receiving notice of such misconduct.  *Id.* Jones does not allege or present any proof that the Faulkner County Sheriff or any other official was notified that the restraint chair policy was not followed.  Accordingly, there is no evidence the Faulkner County Sheriff was aware of and deliberately indifferent to any misuse of the restraint chair policy.  Finally, to establish an unofficial custom, Jones would have to also show that she was injured as a result of the alleged unofficial custom. Again, Jones has not shown that she suffered any specific significant mental or physical injury as a result of her time in the restraint chair.

In sum, Jones has not made sufficient allegations or presented sufficient evidence to establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials, that caused injury to her. Accordingly, Faulkner County is entitled to summary judgment on Jones' official capacity custom claim.

---

bathroom breaks.  *Id.* at 15.  Grant testified that the policy was followed and Jones was offered bathroom breaks.  *See* Doc. No. 32-4 at 41-42.

Failure-to-Train

"The inadequacy of police hiring, training, or supervising may serve as the basis for § 1983 liability only where the failure amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Glasper v. City of Hughes, Arkansas*, 269 F. Supp. 3d 875, 901 (E.D. Ark. 2017) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Claims based on deficient hiring or failure to train and supervise employees require proof that:

> (1) the [municipality]'s practices were inadequate; (2) the [municipality] was deliberately indifferent to the rights of others in adopting them, such that the failure to hire, train, or supervise reflects a deliberate or conscious choice by the [municipality]; and (3) an alleged deficiency in the hiring, training, or supervising procedures actually caused the plaintiff's injury.

*Id.* (citing *B.A.B., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)). "Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness." *Id.* Further, a plaintiff raising an inadequate training/supervision claim must show that the municipality "had notice that its procedures were inadequate and were likely to result in a violation of constitutional rights." *Id.* at 901-902 (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)). *See also Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir. 2010) (plaintiff asserting failure to supervise and train staff must show that supervisor "1) Received notice of a pattern of unconstitutional acts committed by subordinates; 2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

3) Failed to take sufficient remedial action; and 4) That such failure proximately caused injury to [Plaintiff].").

Jones has not alleged any facts or produced any evidence to support an official capacity claim based on lack of training or supervision. Jones alleges that the Defendants were not properly trained in the use of a restraint chair or to provide medical care to an inmate placed in a restraint chair. Sergeant Scott testified that his training in the use of the restraint chair consisted of reviewing jail standards and the jail's policy. *See* Doc. No. 32-6 at 5 & 22. Scott also acknowledged he did not have specific medical training beyond administering CPR. *Id.* Tracee Williams did not remember what training she received regarding the restraint chair. Doc. No. 32-5 at 15. Grant testified she had no specific training on how to mitigate the impact of using a restraint chair on someone with a mental disability. Doc. No. 32-4 at 45-46.

Jones does not describe what training or supervision was provided, how the training or supervision was lacking, or how any lack of training or supervision injured her. As addressed earlier, Jones has not offered any expert testimony to support that she required emergency medical treatment while she was in the restraint chair or that use of the restraint chair worsened her condition. The evidence before the Court establishes that she repeatedly threatened to kill herself and was kept in the restraint chair for her own protection.

Finally, Jones has not even alleged that Faulkner County "had notice that its procedures were inadequate and were likely to result in a violation of constitutional rights." *Glasper v. City of Hughes, Arkansas*, 269 F. Supp. 3d at 901-902. Jones does not allege that the Faulkner County Sheriff had notice of a pattern of unconstitutional acts committed by subordinates related to the claims she asserts; she provides no evidence of any pattern of unconstitutional activity; and she does not allege that the sheriff was aware of any such lack of training or supervision and failed to take remedial action.

In sum, Jones offers no evidence to support her bald assertion that she was injured because Faulkner County did not appropriately train its employees in the use of the restraint chair. Accordingly, the Defendants are entitled to summary judgment on Jones' official capacity training claim.

## D.    *State Law Claims*

Because Jones' federal claims are subject to dismissal, the Court declines to exercise jurisdiction over her state law claims. *See Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) (Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed). These claims are dismissed without prejudice.

## IV.  Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted.  Jones' ADA/RA claims fail as a matter of law and are dismissed with prejudice.  Grant and Scott are entitled to qualified immunity on her individual capacity constitutional claims; those claims are dismissed with prejudice.  Jones' official capacity claims based on the FCDC's restraint chair policy fail and are dismissed with prejudice.  The Court declines to exercise jurisdiction over Jones' supplemental state law claims; accordingly, those claims are dismissed without prejudice.

DATED this 19th day of May, 2021.

_____
UNITED STATES MAGISTRATE JUDGE